**[J-86A-2024, J-86B-2024, J-86C-2024, J-86D-2024 and J-86E-2024]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**

| | | |
|---|---|---|
| BETTER BETS VENTURES, LLC, | : | No. 27 MAP 2024 |
| | : | |
| Appellee | : | Appeal from the Order of the Commonwealth Court at No. 386 CD 2022, entered on October 12, 2023, |
| | : | |
| | : | |
| v. | : | Reversing and Remanding the Decision of the Pennsylvania Gaming Control Board at No. 9378-2020 entered on March 23, 2022 |
| | : | |
| | : | |
| PENNSYLVANIA GAMING CONTROL BOARD, | : | |
| | : | |
| | : | ARGUED:  November 19, 2024 |
| Appellant | : | |
| | | |
| MICHAEL BROZZETTI, | : | No. 28 MAP 2024 |
| | : | |
| Appellee | : | Appeal from the Order of the Commonwealth Court at No. 387 CD 2022, entered on October 12, 2023, |
| | : | |
| | : | |
| v. | : | Reversing and Remanding the Decision of the Pennsylvania Gaming Control Board at No. 9379-2020 entered on March 23, 2022 |
| | : | |
| | : | |
| PENNSYLVANIA GAMING CONTROL BOARD, | : | |
| | : | |
| | : | ARGUED:  November 19, 2024 |
| Appellant | : | |
| | | |
| FRANK BROZZETTI, | : | No. 29 MAP 2024 |
| | : | |
| Appellee | : | Appeal from the Order of the Commonwealth Court at No. 388 CD 2022, entered on October 12, 2023, |
| | : | |
| | : | |
| v. | : | Reversing and Remanding the Decision of the Pennsylvania Gaming Control Board at No. 9380-2020 entered on March 23, 2022 |
| | : | |
| | : | |
| PENNSYLVANIA GAMING CONTROL BOARD, | : | |
| | : | |
| | : | ARGUED:  November 19, 2024 |
| Appellant | : | |

| LENDELL GAMING, LLC, | : | No. 30 MAP 2024 |
| | : | |
| Appellee | : | Appeal from the Order of the |
| | : | Commonwealth Court at No. 389 CD |
| | : | 2022, entered on October 12, 2023, |
| v. | : | Reversing and Remanding the |
| | : | Decision of the Pennsylvania |
| | : | Gaming Control Board at No. 9082- |
| PENNSYLVANIA GAMING CONTROL | : | 2020 entered on March 23, 2022 |
| BOARD, | : | |
| | : | ARGUED: November 19, 2024 |
| Appellant | : | |

| RICHARD TEITELBAUM, | : | No. 31 MAP 2024 |
| | : | |
| Appellee | : | Appeal from the Order of the |
| | : | Commonwealth Court at No. 390 CD |
| | : | 2022, entered on October 12, 2023, |
| v. | : | Reversing and Remanding the |
| | : | Decision of the Pennsylvania |
| | : | Gaming Control Board at No. 9083- |
| PENNSYLVANIA GAMING CONTROL | : | 2020 entered on March 23, 2022 |
| BOARD, | : | |
| | : | ARGUED: November 19, 2024 |
| Appellant | : | |

## OPINION

**JUSTICE WECHT**                                          **DECIDED: March 20, 2025**

The law commonly known as the Video Gaming Act[1] requires applicants for licenses to operate video gaming terminals to demonstrate that they possess "good character, honesty and integrity."[2] The Pennsylvania Gaming Control Board concluded that the applicants in this case were unable to meet this criterion due to their participation in the so-called "skill games" industry. It denied them licenses on that basis. The Commonwealth Court reversed the Board's decision. Because we agree that the Board

---

[1]     4 Pa.C.S. §§ 3101-4506.

[2]     *Id.* §§ 3301(b)(11); 3502(b); 3504(c).

painted with too broad a brush in assessing the character of the applicants, we endorse the Commonwealth Court's rationale. However, because that court went too far in ordering the Board on remand to "issue the requested licenses,"[3] without regard for any other requisites for licensure, we remand to the Board for further consideration of the applications in light of this opinion, without directing any particular result of such consideration.

The instant appeal necessarily touches upon the nature of "skill games"—devices that have become widespread throughout Pennsylvania over the past decade, and that are commonly operated in businesses (such as bars, restaurants, convenience stores, and similar establishments) that the Board has not licensed to offer legal gambling. Although "skill games" share certain features with gambling, proponents of these devices contend that they are lawful to operate in such establishments because they rely predominantly upon the skill of the player rather than the element of chance.

Importantly, the question before us is not whether "skill games" are, in fact, lawful to operate in unlicensed facilities, or whether they constitute unlicensed slot machines, unlawful gambling devices, or the like. Questions of that nature are implicated in other appeals pending before this Court, the merits of which we do not comment upon here.[4] For present purposes, it suffices to observe that, during the periods relevant to the applications at issue, the legality of skill games was (in the Board's words) "debatable,"[5] and that certain Pennsylvania courts had determined that the devices are lawful, or are

---

[3]     *Better Bets Ventures v. Pa. Gaming Control Bd.*, 304 A.3d 66, 79 (Pa. Cmwlth. 2023).

[4]     *See POM of Pa., LLC v. Dep't of Revenue*, 2, 5, & 6 EAP 2024; *In re Three Pa. Skill Amusement Devices*, 50 MAP 2024.

[5]     Pennsylvania Gaming Control Board, Corrected Adjudication, Nos. 9082 - 9083-2020, 9239 - 9240-2020, 9378 - 9380-2020, 3/24/2022 ("Corrected Adjudication"), at 31.

not subject to regulation under the Gaming Act.[6]  The issue before us concerns the Board's sweeping character judgment about all individuals who have engaged in this enterprise while under the belief that their actions were lawful—a belief that was reasonably justified by judicial decisions.  Whether these judicial decisions were, in fact, correct is not the subject of this litigation.  With that caveat, we turn to the matter at hand.

## I. Background

With Act 42 of 2017,[7] the General Assembly added Part III to Title 4 of the Pennsylvania Consolidated Statutes.  Act 42 provides for the licensure and operation of a new category of gambling device called a video gaming terminal.[8]  The Video Gaming Act establishes several categories of licenses, two of which are relevant to this appeal. Section 3502 of the Video Gaming Act sets forth the requirements to obtain a "terminal operator license," which authorizes an entity to place and operate video gaming terminals

---

[6]     Pennsylvania Race Horse Development and Gaming Act, 4 Pa.C.S. §§ 1101-1904; *see, e.g.*, *POM of Pa., LLC v. Dep't of Revenue*, 221 A.3d 717, 724-37 (Pa. Cmwlth. 2019) (*en banc*) (holding that the Gaming Act does not apply to "skill games" operated in unlicensed premises).  Although the Commonwealth Court published this decision in 2019, an appeal therefrom is only now before this Court because the Commonwealth Court did not enter a final, appealable order in the litigation until January 16, 2024.

[7]     Act of October 30, 2017, P.L. 419, No. 42.

[8]     Act 42 of 2017 also amended the definition of a "slot machine" in the Gaming Act to include a "skill slot machine" and a "hybrid slot machine."  The Gaming Act now defines a "skill slot machine" as a "slot machine in which the skill of the player, rather than the element of chance, is the predominant factor in affecting the outcome of the game," and defines a "hybrid slot machine" as a "slot machine in which a combination of the skill of the player and elements of chance affect the outcome of the game."  4 Pa.C.S. § 1103. As noted above, the Commonwealth Court has determined that, notwithstanding these new definitions, "skill games" operated in unlicensed facilities are not subject to the requirements of the Gaming Act at all.  *See POM of Pa.,* 221 A.3d at 724-37; *supra* n.6. More recently, another *en banc* panel of the Commonwealth Court declared that these definitions in the Gaming Act are inapplicable to the criminal statute that addresses the unlawful operation of slot machines and gambling devices, 18 Pa.C.S. § 5513.  *See In re Three Pa. Skill Amusement Devices*, 306 A.3d 432, 437-45 (Pa. Cmwlth. 2023) (*en banc*). Appeals from both of these decisions remain pending in this Court.  *See supra* n.4.

on its premises.[9]  Section 3504 provides for a "principal license" to be obtained by, *inter alia*, an individual who has an ownership interest in an entity that applies for a terminal operator license.[10]  For both classes of license, applicants are required to demonstrate to the Board, by clear and convincing evidence, that they possess "good character, honesty and integrity."[11]

The Video Gaming Act expressly provides the Board with discretion to grant or withhold a license, over and above its general regulatory authority over the gaming industry.  Section 3301(a)(1) grants the Board "general and sole regulatory authority" over the "conduct of video gaming or related activities" and "every aspect of the conduct of video gaming."[12]  That subsection further directs the Board to "ensure the integrity of the acquisition and operation of video gaming terminals."[13]  The Board is specifically empowered, "[a]t its discretion," to "issue, approve, renew, revoke, suspend, condition or deny issuance or renewal" of licenses, including "terminal operator licenses" and any

---

[9]     4 Pa.C.S. § 3502.

[10]     *Id.* § 3504.

[11]     *Id.* §§ 3504(c) ("Following review of the application and the background investigation, the board may issue a principal license if the applicant has proven by clear and convincing evidence that the applicant is a person of good character, honesty and integrity and is eligible and suitable to be licensed as a principal."), 3502(b) ("An application for a terminal operator license shall include such information, documentation and assurances as may be required to establish by clear and convincing evidence of the applicant's suitability, including good character, honesty and integrity.  The application shall include, without limitation, information pertaining to family, habits, character, reputation, criminal history background, business activities, financial affairs and business, professional and personal associates, covering at least the 10-year period immediately preceding the filing date of the application."); 3502(f) ("In order to be eligible for a terminal operator license under this part, the principals and key employees of the applicant must obtain a license to meet the character requirements of this section or other eligibility requirements established by the board.").

[12]     *Id.* § 3301(a)(1).

[13]     *Id.*

"additional licenses, permits or other authorization that may be required" under the Video Gaming Act.[14] In making its licensing decisions, moreover, the Board is directed to consider not only the applicant's "good character, honesty and integrity," but also any potential "threat to the public interest."[15]

In this case, the Board applied these considerations to three sets of applicants. One set of applicants prevailed before the Board, and thus it was the remaining two that sought appellate review. The Board's treatment of all of the applicants, however, is revealing of its ultimate rationale.[16]

## A. Richard Teitelbaum and Lendell Gaming, LLC

Lendell Gaming, LLC, is a Pennsylvania limited liability company, and Richard Teitelbaum is its owner, sole corporate officer, and sole decisionmaker. Teitelbaum is also the sole owner of Lendell Vending, Inc., which operates amusement equipment, ATMs, and jukeboxes at various businesses in Pennsylvania and New Jersey.

---

[14] *Id.* § 3301(b)(2), (6).

[15] *Id.* § 3301(b)(11) ("The board shall have the power and duty . . . [t]o approve an application for or issue or renew a license, certificate, registration, permit or other authorization that may be required by the board, if the board is satisfied that the person has demonstrated by clear and convincing evidence that the person is of good character, honesty and integrity whose prior activities, criminal record, if any, reputation, habits and associations do not pose a threat to the public interest or the effective regulation and control of video gaming terminal operations or create or enhance the danger of unsuitable, unfair or illegal practices, methods and activities in the conduct of video gaming or the carrying on of the business and financial arrangements incidental thereto."); *see also id.* § 3302(a)(1) ("The board shall have the power and duty . . . [t]o deny, deny the renewal of, revoke, condition or suspend a license or permit provided for in this part if the board finds in its sole discretion that an applicant, licensee or permittee under this part or its officers, employees or agents have furnished false or misleading information to the board or failed to comply with the provisions of this part or the rules and regulations of the board and that it would be in the public interest to deny, deny the renewal of, revoke, condition or suspend the license or permit.").

[16] The following account is sourced from the Board's findings of fact, the details of which are undisputed. *See* Corrected Adjudication at 2-23, Findings of Fact ¶¶ 1-105.

Teitelbaum further serves as the President of the Pennsylvania Video Gaming Association, an organization that advocates for the expansion of video gaming operations in restaurants, bars, and social clubs.

Teitelbaum first encountered the "skill games" industry in 2015, when he was approached by Lou Miele, the owner of Miele Manufacturing, Inc., which manufactures skill games for vending companies. Seeking to assure Teitelbaum of the legality of his products, Miele provided Teitelbaum with a copy of a then-recent decision of the Court of Common Pleas of Beaver County (the "Beaver County case"),[17] which had concluded that a specific device that Miele manufactured—a machine branded "Pennsylvania Skill" that utilizes software made by Pace-O-Matic, Inc. ("POM")—was not an illegal gambling device, and thus was presumably lawful to operate without a license from the Board. Miele also offered Teitelbaum a copy of testimony that then-Director of the Pennsylvania State Police's Bureau of Liquor Control Enforcement, Major Thomas Butler, recently had given to the Pennsylvania House of Representatives Gaming Oversight Committee, in which he acknowledged that certain court decisions had concluded that skill games were not illegal gambling devices. At that time, Major Butler indicated that the Pennsylvania State Police would not take action against operators of skill games, absent a change in the law.

Satisfied with Miele's representations concerning the legality of the devices, in early 2016, Teitelbaum—through Lendell Vending—began purchasing skill games from Miele Manufacturing and offering them to businesses in Pennsylvania. Teitelbaum, however, offered only the "Pennsylvania Skill" brand of games because he did not feel comfortable operating any devices that had not been specifically court-approved. As of

---

[17] *In re Pace-O-Matic, Inc. Equip., Terminal I.D. No. 142613*, M.D. 965-2013 (C.C.P. Beaver Cnty. Dec. 23, 2014).

July 1, 2019, Lendell Vending had provided 211 "Pennsylvania Skill" machines to 125 businesses in Pennsylvania, including bars, restaurants, gas stations, convenience stores, veterans' clubs, and smoke shops.

Meanwhile, even following the passage of Act 42 of 2017, Miele and POM continuously provided newsletters to skill game operators that were intended to assure them of the legality of the devices. Although Teitelbaum did not consult with his own attorney for advice on the matter, he relied upon the representations in these newsletters, some of which expressed the legal opinion of Miele's attorney, Matthew H. Haverstick, Esq., and contained references to court opinions that Miele found supportive of the legality of skill games. In this manner, Teitelbaum became aware of, for instance, the Commonwealth Court's 2019 decision in *POM of Pennsylvania*, in which that court held that the "Pennsylvania Skill" brand of machines would meet the definition of "slot machine" provided in the Gaming Act after the passage of Act 42 of 2017, but that the Gaming Act was not intended to regulate machines operated in unlicensed facilities.[18]

After the enactment of the Video Gaming Act, in August 2018, Teitelbaum sought to enter the new video gaming industry. He applied for a video gaming principal license for himself and a terminal operator license for Lendell Gaming. In October 2018, the Board issued Teitelbaum and Lendell Gaming conditional licenses, pending a background investigation and final licensing decision.[19] Throughout the next year, however, the legal controversies surrounding skill games intensified. On June 12, 2019, the Pennsylvania Liquor Control Board provided notice to liquor licensees of the Board's view that skill games are illegal, and that operation of such games by licensees would result in the imposition of citations by the Board. Miele Manufacturing quickly sent emails to operators

---

[18]     *See supra* nn. 4, 6, 8.

[19]     *See* 4 Pa.C.S. § 3520 (providing for conditional licenses).

of its skill games, including Teitelbaum, declaring that the information in the Liquor Control Board's notice was false. Miele's counsel, Attorney Haverstick, sent a letter to counsel for the Liquor Control Board, in which he stated that the Board's notice was "false" and "defamatory" and warned against further aspersions upon the legality of skill games.[20] Miele forwarded Attorney Haverstick's letter to Teitelbaum and other skill game operators, and Teitelbaum relied upon it in making his decision to continue offering the "Pennsylvania Skill" games to his customers.

The Board's background investigation into Teitelbaum and Lendell Gaming proceeded during this same period in 2019. In June of that year, the investigator assigned to review Teitelbaum's background, Sean Fleming, emailed Teitelbaum and asked him if he operated skill games. Teitelbaum responded in the affirmative, and ultimately provided a list of the machines that he operated, along with their locations. Teitelbaum eventually asked Fleming if his involvement with skill games would pose a problem for his license application; Fleming told Teitelbaum that the decision was not his to make. Although this line of inquiry concerned Teitelbaum, he elected to continue his participation in the skill games industry because he did not want to lose business to his competitors, and because no court had ruled that the games he offered are illegal.

Also in June 2019, the Pennsylvania House Gaming Oversight Committee held a hearing concerning electronic gambling devices. During that hearing, the Committee received testimony from the Director of the Pennsylvania State Police's Bureau of Liquor

---

[20] Corrected Adjudication at 6, Finding of Fact ¶ 22. Parenthetically, POM ultimately commenced a lawsuit against the Bureau of Liquor Control Enforcement, claiming that its assertions of the illegality of POM devices caused an injury to POM's reputation under Article I, Section 1 of the Pennsylvania Constitution, PA. CONST. art. I, § 1. That litigation is presently stayed "pending a final appellate determination of the POM Games' legality under Section 5513 of the Pennsylvania Crimes Code." *POM of Pa., LLC v. Bureau of Liquor Control Enf't*, 222 M.D. 2022, 2023 WL 4418536, at *6 (Pa. Cmwlth. July 10, 2023) (unreported).

Control Enforcement, Major Scott T. Miller, and from the Executive Director of the Pennsylvania Lottery, Drew Svitko. Svitko and Major Miller testified to their belief that skill games are already illegal under Pennsylvania law. They also detailed numerous objections to the manner in which the skill games industry operates in Pennsylvania. As discussed below, this testimony—which was part of the stipulated record before the Board—loomed large in the Board's rationale for denying the license applications at issue here.

On February 27, 2020, the Board's Office of Enforcement Counsel ("OEC") sent Teitelbaum and Lendell Gaming a notice of its recommendation that the Board deny their applications due to their connections to businesses that provide and operate skill games. Teitelbaum and Lendell Gaming sought a hearing before the Board to challenge that recommendation.

**B. Michael Brozzetti, Frank Brozzetti, Jr., and Better Bets Ventures, LLC**

Better Bets Ventures, LLC, is a Pennsylvania limited liability company owned by Michael and Frank Brozzetti, each of whom owns a 50% interest therein. At the time of the Board's determination, the Brozzetti brothers each also owned a 33.33% interest in Hugo Amusements, LLC ("Hugo"), another Pennsylvania limited liability company. The remaining third of Hugo was owned by their father, Frank Brozzetti, Sr., who has since died. Hugo has provided skill games to Pennsylvania businesses since 2015. As of July 16, 2020, the Board noted, Hugo had provided 155 such machines to 86 businesses in Pennsylvania.

Hugo has supplied not only the devices branded "Pennsylvania Skill"—with which much of the above-mentioned litigation was specifically concerned—but also other brands of skill games. Included in Hugo's offerings were brands of games called the "Diamond

Choice Skill Game 1" and "Diamond Choice Skill Game 2."[21] These particular games were addressed in a decision of the Court of Common Pleas of Luzerne County (the "Luzerne County case"), which, on March 23, 2017, held that they constituted illegal gambling devices under Section 5513 of the Crimes Code.[22]

The Brozzetti brothers initially decided to enter the skill games industry, via Hugo, in reliance upon the Beaver County case, which had upheld the lawfulness of the "Pennsylvania Skill" devices in 2014. The Brozzettis did not, however, consult their own attorney to advise them on the legality of their operations. The Brozzettis also never discussed their decision to participate in the skill games industry with anyone at the Board, until the matter came up during their background investigations.

In early 2019, the Brozzetti brothers filed applications under the Video Gaming Act for principal licenses for themselves and for a terminal operator license for Better Bets Ventures, and the Board granted them conditional licenses. On August 19, 2020, OEC sent a notice to the Brozzettis and to Better Bets Ventures, informing them that it was recommending that the Board deny their license applications due to their participation in the skill games industry. The Brozzettis and Better Bets Ventures then sought a hearing before the Board to challenge that recommendation.

### C. Brent Mayes and Venture Gaming, LLC

Venture Gaming, LLC, is a Pennsylvania limited liability company owned solely by Brent Mayes. Mayes also owns a 57% interest in a company called Pro ATM, LLC, which owns and operates ATMs at various businesses in Pennsylvania. Mayes decided to enter the skill games industry, via Pro ATM, after speaking to Lou Miele in 2016, who convinced

---

[21] Corrected Adjudication at 20, Finding of Fact ¶ 92(e).

[22] *Commonwealth v. $3,726.91 U.S. Currency, (2) Video Gambling Machines*, 2016 CV 11507 (C.C.P. Luzerne Cnty. Mar. 23, 2017).

Mayes of the legality of the devices manufactured by Miele's company. Mayes also had informal discussions with an attorney, who opined that operating skill games in an unlicensed setting was lawful in Pennsylvania at the time. Like Teitelbaum, Mayes chose to deal only with the "Pennsylvania Skill" brand of games because these were the only devices that had specifically been found lawful by a Pennsylvania court. Also like Teitelbaum, Mayes was a recipient of Miele's newsletters, which regularly asserted that its devices are lawful.

In May 2018, Mayes applied for a video gaming terminal principal license for himself, and a terminal operator license for Venture Gaming. The primary distinction between Mayes' conduct and that of Teitelbaum and the Brozzetti brothers was that Mayes elected to exit the skill games industry during the course of his background investigation. When a Board investigator asked Mayes whether he participated in the skill games industry, Mayes became concerned that his involvement therein would jeopardize his ability to obtain a license under the Video Gaming Act. Accordingly, he contacted the Board to inform it that he planned to sell the devices in his possession and to exit the industry. On June 21, 2019, Pro ATM, with Mayes as the signatory, sold its "Pennsylvania Skill" machines to Scottsdale Music, LLC, and Mayes signed an affidavit stating that he had no intention to participate in the skill games industry in the future. Mayes then sent notices to the businesses to which he previously had supplied skill games, informing them that he planned to terminate their terminal placement agreements.

On June 12, 2020, OEC sent a notice to Mayes and Venture Gaming informing them of its recommendation that the Board deny their license applications due to Mayes' prior participation in the skill games industry. Mayes and Venture Gaming then sought a hearing before the Board to challenge that recommendation.

### D. The Board's Rationale

The Board voted unanimously to accept OEC's recommendations to deny the applications of Teitelbaum and Lendell Gaming, as well as the applications of the Brozzetti brothers and Better Bets Ventures. By contrast, the Board voted unanimously to reject OEC's recommendation concerning Mayes and Venture Gaming. The basis for the Board's decision on each application, as well as its basis for distinguishing between Mayes and the others, was its assessment of the Video Gaming Act's "good character, honesty and integrity" requirement.[23] That determination, however, turned entirely upon the Board's assessment of the skill games industry as a whole, rather than upon any action or characteristic of any particular applicant.

The Board began by relating OEC's position that, notwithstanding any judicial decisions to the contrary, "skill games" are not lawful devices. "OEC considers these games to be unregulated 'slot machines' and 'video gaming terminals' as defined by the Gaming Act and the Video Gaming Act, respectively."[24] If they are properly classified as such, the Board related, then the applicants for several years had been in violation of numerous provisions of the Video Gaming Act, the Gaming Act, the Crimes Code, and the Board's regulations. OEC believed that "these violations demonstrated Mr.

---

[23] In its adjudication, the Board engaged in some discussion of the "public interest" considerations provided by the Video Gaming Act, *see supra* n.15, but such was not the basis for the Board's decision. "Regardless of the legality" of the applicants' conduct, the Board noted that it could deny their applications if it were to conclude that their "actions are otherwise contrary to the public interest." Corrected Adjudication at 26. The applicants had argued that OEC's notices did not adequately inform them that any "public interest" inquiry would be at issue, and the Board rejected that argument, concluding that the notices provided ample notice of such. *See id.* at 25-26. The Board thus stated that it would consider the public interest in making its decision. *Id.* at 26. However, the Board never returned to the matter, and instead based its decision solely upon the "good character, honesty and integrity" requirement. *See id.* at 37-38.

[24] Corrected Adjudication at 23.

Teitelbaum, Mr. Mayes, and the Brozzettis do not possess the good character and integrity required for licensure as video gaming terminal principals."[25]

The Board, however, did not rest its decision upon the determination that skill games are, in fact, illegal—a matter that the Board characterized as "debatable."[26] Rather, the Board declared, its character assessment "goes beyond looking at the applicants' compliance with the law."[27] Beyond any direct violation of the law, the Video Gaming Act directs the Board to consider an applicant's "family, habits, character, reputation, criminal history background, business activities, financial affairs and business, professional and personal associates" for a period of ten years prior to the filing of the application.[28] The Board stressed that "compliance with the law is relevant," but the "suitability assessment goes much further," and an "applicant could have no history of violating the law but still lack the 'good character, honesty, and integrity' required to hold a license."[29] This "all-encompassing review," the Board opined, was essential for it to meet its statutory obligation to "ensure the integrity of the acquisition and operation of video gaming terminals."[30]

With this understanding of its task, the Board turned to its assessment of the problems posed by the skill games industry. "Regardless of the legality of 'skill-based' games," the Board stressed, "their offer for play and operation is contrary to the positions

---

[25]    *Id.* at 24.

[26]    *Id.* at 31.

[27]    *Id.* at 27.

[28]    *Id.* (quoting 4 Pa.C.S. § 3502(b)).

[29]    *Id.* at 27-28.

[30]    *Id.* at 28 (quoting 4 Pa.C.S. § 3301(a)(1)).

taken by various government agencies."[31]  The Board placed great weight upon the testimony of Major Miller and Drew Svitko before the House Gaming Oversight Committee.  These witnesses identified numerous issues with skill games in general.[32] Invoking Major Miller's testimony, the Board emphasized that skill games typically are operated in unregulated environments, which do not impose the sort of controls that are required of licensees under the Board's purview.  Specifically, these unlicensed facilities often lack controls to prevent minors from using the machines, as well as those who engage in compulsive gambling.  Skill games further lack mandatory pay-out requirements and can thereby take advantage of players.  The Board reasoned that these ills primarily followed from the lack of regulation over the skill games industry, and it contrasted the areas of concern with the provisions of the Video Gaming Act and the Board's regulations that, *e.g.*, require licensees to prevent minors from using gaming devices, impose minimum pay-out percentages, require approval of site plans to ensure the adequacy of security and surveillance measures, create requirements for advertising of the games, and require the posting of signs containing a toll-free telephone number for help with compulsive and problem gambling.[33]  "'Skill-based' games in unlicensed locations," the Board stressed, "do not contain *any* of these safeguards."[34]

Although the applicants' counsel had suggested that skill game operators can— through "self-regulation"—sufficiently protect against the harms that the Board identified,

---

[31]     *Id.*

[32]     As the Board presently stresses, this testimony was included in the stipulated record, and the Board detailed the testimony in its findings of fact.  *See* Corrected Adjudication at 9-10, 17-18, 21-22, Findings of Fact ¶¶ 38-41, 81-84, 99-102.

[33]     Corrected Adjudication at 29-31.

[34]     *Id.* at 31 (emphasis in original).

the Board nonetheless declared that it was "not swayed."[35]  For instance, the Board was unmoved by counsel's representation that there often are stickers on skill games warning that they are not to be used by people under the age of eighteen.  Not only was this insufficient to ensure that minors do not use the devices, but it was "not lost on the Board" that the legal age to gamble in Pennsylvania is twenty-one, not eighteen.[36]  Similarly, the Board found it improbable that skill game operators would voluntarily assume the responsibility to guard adequately against compulsive and problem gambling.  Absent legally binding requirements, the Board deemed the applicant's "claims of self-regulation to be woefully inadequate when compared to the actual protections implemented by the Gaming Act, the Video Gaming Act, and the Board's regulations."[37]

As a separate matter, the Board further expressed its concern for the loss of revenue at licensed gaming facilities caused by competition from skill game operators.  Skill games, the Board stated, "cannibalize business from casinos, licensed truck stop establishments, and lottery games."[38]  The Board reiterated Drew Svitko's testimony, in which he estimated that the Pennsylvania Lottery loses $138 million annually to the skill games industry, which consequently causes a loss to the beneficial programs supported by lottery revenue.  The Board further cited the losses sustained by the casino industry, pointing out that multiple casinos have reduced their number of slot machines due to the competition from skill games.  The proliferation of skill games in unlicensed facilities, the Board opined, also poses a threat to "public confidence and trust in legalized gaming," because, through their marketing and their common placement in proximity to state-

---

[35]     *Id.* at 32.

[36]     *Id.* at 32 n.1.

[37]     *Id.* at 33.

[38]     *Id.* at 34.

sanctioned lottery machines, skill games give the impression of governmental approval of gambling in unlicensed facilities.[39]

The Board summed up its rationale as follows:

> Overall, the Board believes that gaming is best conducted in an environment that is strictly controlled and regulated. Such an environment requires surveillance and security measures, protections against underage gaming, protections against compulsive and problem gambling, the requiring of approved internal controls to safeguard assets, an overarching body of law to regulate the conduct, and a government agency to oversee and enforce these protections. "Skill-based" games in unlicensed locations do not contain any of these protections.[40]

Returning to the particular license applications before it, the Board explained that its conclusions about the *skill games industry*—as a whole—were dispositive of the *individual applicants'* ability to satisfy the "good character, honesty, and integrity" requirement. "Collectively," the Board stated, "the record shows that the applicants are, or were, involved in an industry that possesses none of the oversight and public protection required to ensure the integrity of their gaming operations."[41] With regard to Teitelbaum and the Brozzetti brothers, the Board declared that their "continued involvement in this industry" cast doubt upon their characters, such that they failed to establish by clear and convincing evidence that they were suitable for licensure.[42] The Brozzettis' suitability was further "tarnished," the Board stated, by their operation of the two "Diamond Choice" games that were found to be illegal gambling devices in the Luzerne County case.[43]

---

[39]     *Id.* at 36.

[40]     *Id.* at 37.

[41]     *Id.*

[42]     *Id.*

[43]     *Id.*; *see also id.* at 27 (finding substantial evidence that the Brozzettis, through Hugo, operated illegal gambling devices for purposes of 18 Pa.C.S. § 5513).

Because the Board found Teitelbaum and the Brozzetti brothers to be unsuited for licensure as video gaming terminal principals, it necessarily found their companies ineligible for terminal operator licenses, and thus denied all of their applications.[44]

The Board reached a different conclusion about Mayes. Mayes voluntarily exited the skill games industry as soon as he began to suspect that his involvement therein could be a problem for his license application. The Board opined that this decision reflected positively on Mayes' character, and it "contrast[ed] his decision with those of the Brozzettis and Mr. Teitelbaum to remain in the industry despite the vehement, public opposition by government agencies and public officials who rightfully view 'skill-based' games as a threat to the public."[45] Unlike Teitelbaum and the Brozzetti brothers, Mayes' decision signaled to the Board "that he possesses the good character, honesty, and integrity required to hold a video gaming terminal principal license."[46] Thus, the Board rejected OEC's recommendation to deny the applications of Mayes and Venture Gaming and, for those applicants only, "remanded to the Bureau of Investigations and Enforcement for the completion of all outstanding investigative work."[47]

The two sets of applicants that did not prevail before the Board—Teitelbaum and Lendell Gaming, along with the Brozzettis and Better Bets Ventures—appealed the Board's adjudication and order to the Commonwealth Court.

---

[44]    *Id.* at 37 (citing 4 Pa.C.S. § 3502(f) ("In order to be eligible for a terminal operator license under this part, the principals and key employees of the applicant must obtain a license to meet the character requirements of this section . . . .")).

[45]    *Id.* at 38.

[46]    *Id.*

[47]    *Id.* at 39.

### E. Commonwealth Court's Decision

In a unanimous opinion, the Commonwealth Court reversed the Board's decision. The court recognized that, under Section 704 of the Administrative Agency Law, its task was to determine whether, *inter alia*, the Board's adjudication was "in accordance with law."[48]  A legal error may be found, the Commonwealth Court noted, where an agency's decision "represents a manifest and flagrant abuse of the agency's discretion or a purely arbitrary execution of its duties or functions."[49]  It was this manner of error that the Commonwealth Court discerned in the Board's rationale.

The Commonwealth Court first reviewed the provisions of the Video Gaming Act that require applicants for a principal license to demonstrate their "good character, honesty and integrity," and that grant the Board discretion to deny a license application when an applicant fails to meet that standard.[50]  The court found these provisions to be "clear and free from ambiguity," and accordingly declared that the "Board's interpretation of them is entitled to no deference by this Court."[51]  The Commonwealth Court noted that, for its character assessment, the Board relied solely upon its criticisms of the skill games industry as a whole.  These criticisms of the industry, the Commonwealth Court opined, distilled to two overarching problems that the Board identified: (1) that the industry's unregulated nature fails to guard adequately against various ills associated with unregulated gambling, such as the prevention of underage and problem gambling, and (2) that the industry caused a decrease in revenue generated by the legal gambling

---

[48]    2 Pa.C.S. § 704.

[49]    *Better Bets Ventures*, 304 A.3d at 73 (citing *Slawek v. State Bd. of Med. Educ. & Licensure*, 586 A.2d 362, 365 (Pa. 1991)).

[50]    *Id.* at 75 (quoting, *inter alia*, 4 Pa.C.S. §§ 3301(b)(11), 3504(c)).

[51]    *Id.* (citing *Crown Castle NG E. LLC v. Pa. Pub. Util. Comm'n*, 234 A.3d 665, 667-68 (Pa. 2020)).

industry and the lottery.[52]  The court declared that these findings reflected the Board's "policy determinations and nothing more."[53]

"More importantly," the Commonwealth Court opined, the Board did not indicate "how the problems it finds with the skill games industry denigrate and render unsuitable the 'character, honesty and integrity' of *these specific Petitioners*," *i.e.*, Teitelbaum and the Brozzetti brothers.[54]  The court noted that the Board identified no criminal convictions or investigations of the applicants, no tax-evading financial practices, no connections with organized crime, no false statements, and no otherwise nefarious conduct.  The Board did not find that any of the applicants were uncooperative during their background investigations.  The Board's character assessment, the Commonwealth Court stressed, was based exclusively upon the applicants' "association with the skill games industry and the problems the Board perceives to be associated with it"—a basis for decision that the court found to be "wholly insufficient" to support the denial of the applications.[55]  "The Board's denunciation of Petitioners' character by mere association with this industry, which the Board simply does not like, cannot, without more, constitute a valid and reasonable exercise of the Board's discretion in considering and denying these Applications."[56]  The Commonwealth Court concluded that the Board abused its discretion by relying solely upon its criticisms of the industry in general, rather than upon any finding particularized to the applicants actually before the Board.

---

[52]     *Id.* at 76.

[53]     *Id.*

[54]     *Id.* (emphasis in original).

[55]     *Id.*

[56]     *Id.*

With regard to the "public interest," the Commonwealth Court noted that this phrase appears in two provisions of the Video Gaming Act, and it was "not clear which of these two sections of the Video Gaming Act the Board relied upon" in denying the applications.[57] The Board did not, in fact, purport to rely upon either provision of the Video Gaming Act that refers to the public interest. Rather, the Board based its decision upon the "good character, honesty and integrity" requirement. Regardless, the Commonwealth Court opined that neither "public interest" provision would support the Board's denial of the license applications at issue.

Finally, the Commonwealth Court rejected the Board's finding of substantial evidence that the Brozzetti brothers operated illegal gambling devices through their business, Hugo Amusements—specifically the "Diamond Choice" devices that were determined to be illegal gambling devices in the Luzerne County case. The Commonwealth Court stressed that, regardless of the conclusion of a single Court of Common Pleas, the question of whether skill games may constitute illegal gambling devices under the Crimes Code remained unsettled, and was implicated in other appeals that were then pending before the Commonwealth Court.[58] In any event, the Commonwealth Court deemed the Board's findings lacking because the "Diamond Choice" games were operated by "a *separate entity* (Hugo), which is owned *only in part* by the Brozzettis."[59] Due to the purportedly "attenuated connections between Hugo's

---

[57] *Id.* at 77 (discussing 4 Pa.C.S. §§ 3301(b)(11), 3302(a)(1)).

[58] *Id.* at 78-79. The Commonwealth Court cited the then-pending appeal in *In re Three Pennsylvania Skill Amusement Devices*, which, as noted above, ultimately concluded that the definition of a "slot machine" provided in the Gaming Act does not apply to the term "slot machine" in Section 5513 of the Crimes Code, and that the "skill games" at issue there were not illegal gambling devices for purposes of Section 5513. An appeal from that decision remains pending in this Court. *See supra* nn. 4 & 8.

[59] *Better Bets Ventures*, 304 A.3d at 78 (emphasis in original).

business activities and the Brozzettis," the Commonwealth Court deemed the Board's findings "insufficient" to establish that the Brozzettis had operated illegal gambling devices.[60]

Although the applicants raised a number of other challenges to the Board's adjudication, the Commonwealth Court found it unnecessary to address them in light of its finding that the Board "erred and abused its discretion" in denying the applications on its stated grounds.[61] The court accordingly reversed the Board's adjudication. Without regard for any other outstanding issue or requirement for licensure, however, the Commonwealth Court issued an order remanding to the Board "with instructions to issue the requested licenses."[62]

The Board sought this Court's review, which we granted in order to address the following question, as the Board framed it:

> Did the Commonwealth Court err in ruling, contrary to previous holdings by both the Commonwealth Court and Supreme Court, that the Board is not entitled to deference in determining whether an applicant has the requisite "good character, honest, and integrity" to be licensed by the Board?[63]

## II. Arguments

The Board contends that its application of the Video Gaming Act's "good character, honesty and integrity" requirement is entitled to deference on appeal, and that the Commonwealth Court disregarded this deferential standard of review in favor of its own

---

[60]    *Id.* At the time, the Brozzetti brothers each owned 33.33% of Hugo, thus together owning two-thirds of the company. Corrected Adjudication at 19, Finding of Fact ¶ 90. Following the death of their father, each Brozzetti brother now owns a 50% interest in Hugo. *See* Appellees' Br. at 4 n.2.

[61]    *Better Bets Ventures*, 304 A.3d at 79.

[62]    *Id.*

[63]    *Better Bets Ventures, LLC v. Pa. Gaming Control Bd.*, 317 A.3d 983 (Pa. 2024) (*per curiam*).

independent assessment of the evidence. The Board stresses that the Video Gaming Act grants it exclusive discretion over licensing decisions, and that the Board accordingly is the sole arbiter of an applicant's suitability for licensure. Because the Board makes licensing decisions through an adjudicatory process, it notes that appellate review is governed by Section 704 of the Administrative Agency Law, which, in relevant part, directs a court to affirm an agency's adjudication unless it "is not in accordance with law"— a standard that has been understood as including "a manifest and flagrant abuse of discretion or a purely arbitrary execution of the agency's duties or functions."[64]

Review for an abuse of an agency's discretion, the Board emphasizes, does not allow a court to reverse an agency's adjudication merely because it "might have a different opinion or judgment" about an agency's discretionary decision—"judicial discretion may not be substituted for administrative discretion."[65] It is this sort of error with which the Board charges the Commonwealth Court. The Board places particular emphasis upon one line of the Commonwealth Court's opinion, in which the court stated that the governing statutory provisions are "clear and free from ambiguity, and, therefore, the Board's interpretation of them is entitled to no deference."[66] The Board understands this statement as an indication that the Commonwealth Court failed to apply the correct standard of review over an agency adjudication—that the court "gave *no deference* to the Board's decision and re-weighed the evidence in the manner it saw fit."[67]

The Board additionally faults the Commonwealth Court for citing a decision that involved questions of deference to an agency's statutory interpretation, contending that

---

[64] Board's Br. at 26-27 (quoting 2 Pa.C.S. § 704; *Slawek*, 586 A.2d at 365).

[65] *Id.* at 28 (quoting *Ass'n of Pa. State Coll. & Univ. Facs. v. Pa. Labor Rels. Bd.*, 8 A.3d 300, 305 (Pa. 2010)).

[66] *Better Bets Ventures*, 304 A.3d at 75.

[67] Board's Br. at 35 (emphasis in original).

the court "should have relied on cases discussing the standard to apply to an agency's discretionary decision."[68]  The Board does not suggest that the dispositive question here is one of statutory interpretation, but, even if it were, the Board claims that its interpretation "should be given deference because the applicable language is ambiguous."[69]   Its argument on that score is based solely upon the view that the "phrase 'good character, honesty and integrity' contains subjective language that invites conflicting interpretations," and that reasonable minds therefore may differ as to whether a person exhibits these traits.[70]   Thus, to the extent that there is any question as to the meaning of "good character, honesty and integrity," the Board suggests that courts should defer to its statutory interpretation.  The Board also claims an even greater entitlement to judicial deference due to its experience and expertise in reviewing gaming license applications, which renders it particularly well-suited to apply the statutory character requirement.

Returning to the Commonwealth Court's alleged overreach in its application of the standard of review, the Board complains of the court's assertion that the Board's assessment of the skill games industry reflected its "own policy determinations and nothing more."[71]   The Board insists that its findings were not merely its own policy determinations, but rather were based upon evidence contained in the stipulated record, to wit, the testimony of Major Miller and Drew Svitko before the Gaming Oversight Committee.  The Board's findings, it therefore contends, were not statements of policy

---

[68]     *Id.* at 35-36 (emphasis omitted).

[69]     *Id.* at 37.  *But see id.* at 20-21 ("[T]his appeal has nothing to do with an interpretation of statutory language.  At no time during this litigation did the applicants argue that the Board erred in interpreting a statute.  Rather, this appeal was solely a challenge to the Board's exercise of discretion, the type of administrative action subject to deferential review.").

[70]     *Id.* at 38.

[71]     *Id.* at 43 (quoting *Better Bets Ventures*, 304 A.3d at 76).

preference, but rather findings of fact based upon evidence in the record. The Board suggests that it was the Commonwealth Court that ruled based upon its own preferences, as the court emphasized the absence of evidence that the applicants had criminal records, that they had engaged in tax evasion or other deceptive practices, that they were connected to organized crime, that they were uncooperative with the Board's investigators, etc. In the Board's view, these were simply facts that the Commonwealth Court believed to be more important than the testimony of Major Miller and Drew Svitko, testimony to which the Commonwealth Court effectively assigned no weight. In this manner, the Commonwealth Court, "in a not-so-subtle way, was reweighing the evidence the way it deemed appropriate."[72] Similarly, the Board objects to the Commonwealth Court's downplaying of the applicants' involvement with skill games as a "mere association" with the industry, as well as its declaration that the "Board simply does not like" the skill games industry.[73] These components of the Commonwealth Court's decision, the Board argues, suggest that the court substituted its own judgment for that of the Board and intruded upon the Board's fact-finding prerogative and discretionary authority, in violation of the court's standard of review under Section 704 of the Administrative Agency Law.

For their part, the applicants contend that there is no dispute about the correct standard of review—the parties and the Commonwealth Court all agreed that the court's review was governed by Section 704 of the Administrative Agency Law. The applicants note that the Commonwealth Court correctly cited the standard under Section 704.[74] Indeed, the applicants point out that both the Board and the Commonwealth Court relied

---

[72]    *Id.* at 45.

[73]    *Id.*

[74]    Appellees' Br. at 17 (citing *Better Bets Ventures*, 304 A.3d at 73).

upon the same case—*Slawek*—for their understanding of the "not in accordance with law" component of that standard, to the extent that it encompasses a "manifest and flagrant abuse of the agency's discretion or a purely arbitrary execution of its duties or functions."[75] The Board's complaints about the alleged misapplication of the standard of review, applicants stress, derive from a single sentence in the Commonwealth Court's opinion, where the court stated that the relevant statutory language was unambiguous and, therefore, that the Board's *statutory interpretation* was not entitled to deference.[76] In the applicants' view, this observation did not mean that the court failed to apply the correct standard of review over the Board's adjudication.

Like the Board, the applicants do not view this appeal as implicating a question of statutory interpretation. But, to the extent that the Board suggests that "good character, honesty and integrity" is an ambiguous phrase, the applicants differ. After discussing various dictionary definitions of the constituent words, the applicants contend that the phrase is clear, and that they do not have a dispute with the Board over its meaning. The applicants suggest that, "just because reasonable persons may disagree over whether a particular set of facts demonstrates a person has good character, honesty, and integrity, does not mean the terms 'good character,' 'honesty,' or 'integrity' are ambiguous."[77] The applicants clarify that their dispute with the Board concerns the *application* of the statutory terms, not their interpretation. In any event, even if one were to agree with the Board that the statutory language is ambiguous, the applicants argue that the Board's interpretation is still not entitled to judicial deference.

---

[75] *Id.* at 19 (citing *Better Bets Ventures*, 304 A.3d at 73 (citing *Slawek*); Board's Br. at 28 (quoting *Slawek*)).

[76] *Id.* at 19-20 (citing *Better Bets Ventures*, 304 A.3d at 75).

[77] *Id.* at 22.

The applicants agree with the Commonwealth Court that the Board's adjudication reflects an abuse of its discretion over licensing decisions. In the applicants' view, the Board's decision was "arbitrary" because it relied solely upon problems that it associated with the skill games industry in general, and it cited no evidence concerning the character of the specific applicants. The applicants contend that, contrary to the Board's assertion, the Commonwealth Court did not "re-weigh" the evidence concerning their characters, because there was no such evidence in the first place. By pointing out the absence of any criminal record, tax evasion, connections to organized crime, and so on, the Commonwealth Court was merely highlighting the sort of evidence that *would* support the Board's decision, but "such evidence was non-existent."[78] Moreover, the applicants assert that the law surrounding the legality of skill games was unsettled at the time, and they contend that the Board's denial of their applications "based upon their association with an industry that at that time was not clearly illegal is itself arbitrary."[79]

## III. Discussion

At the outset, we note that, despite the parties' discussion of questions of "deference" to an administrative agency's interpretation of a statute, the instant appeal does not implicate any question of statutory interpretation. Although the Board suggests that the operative statutory phrase—"good character, honesty and integrity"—refers to inherently subjective concepts that render the language ambiguous, this appeal does not call upon us to resolve any ambiguity in statutory language. "A statute is ambiguous when there are at least two reasonable interpretations of the text."[80] The parties do not differ

---

[78] *Id.* at 30.

[79] *Id.* at 33.

[80] *A.S. v. Pa. State Police*, 143 A.3d 896, 905-06 (Pa. 2016) (citing *Freedom Med. Supply, Inc. v. State Farm Fire & Cas. Co.*, 131 A.3d 977, 984 (Pa. 2016); *Warrantech Consumer Prod. Servs. v. Reliance Ins. Co. in Liquidation*, 96 A.3d 346, 354-55 (Pa. (continued…)

in any respect over the meaning of the words "character," "honesty," or "integrity." These are not technical words or terms of art; they are used in the statute in the sense that an ordinary reader would understand them.[81] Because the Board and the applicants understand these terms in precisely the same way, there is no question of statutory interpretation for this Court to resolve. As the Board itself recognizes, "this appeal has nothing to do with an interpretation of statutory language."[82] Accordingly, this appeal also does not implicate any question relating to judicial deference to an agency's interpretation of a statute.[83]

As the applicants point out, the Board's digression into this subject appears to have been inspired by the Commonwealth Court's isolated statement, following its quotation of the operative language of the Video Gaming Act, that the statutory provisions were unambiguous and, thus, that the "Board's interpretation of them is entitled to no deference" on appeal.[84] The court was correct in this regard, but that is beside the point. The Commonwealth Court, prior to reaching the substance of its analysis, merely commented on the clarity of the statutory language that it was addressing. This does not mean that the court disregarded its standard of review over the Board's adjudication. The

---

2014); *Delaware Cnty. v. First Union Corp.*, 992 A.2d 112, 118 (Pa. 2010)). We note that we have also found ambiguity in a statute where its language raises "non-trivial interpretive difficulties" on its face. *McGrath v. Bureau of Pro. & Occupational Affs., State Bd. of Nursing*, 173 A.3d 656, 662 n.8 (Pa. 2017). This is not such a circumstance.

[81] *See* 1 Pa.C.S. § 1903 (providing that ordinary, non-technical words and phrases in a statute "shall be construed according to rules of grammar and according to their common and approved usage").

[82] Board's Br. at 20; *see also* Board's Reply Br. at 6 (noting that the "Board's interpretation of a statute was never at issue" in the proceedings below because the applicants never argued that the Board "misinterpreted statutory language").

[83] *See Crown Castle*, 234 A.3d at 667-68 ("[A]n agency's interpretation of a clear and unambiguous statute is not entitled to deference.").

[84] *Better Bets Ventures*, 304 A.3d at 75 (citing *Crown Castle*, 234 A.3d at 667-68).

remainder of the Commonwealth Court's opinion made clear that the court indeed cited, discussed, and applied the correct standard of review.

Turning to that standard of review, all parties, as well as the court below, correctly have recognized that, as an appeal from the Board's adjudication, review is governed by Section 704 of the Administrative Agency Law. Section 704 provides as follows:

> The court shall hear the appeal without a jury on the record certified by the Commonwealth agency. After hearing, the court shall affirm the adjudication unless it shall find that the adjudication is in violation of the constitutional rights of the appellant, or is not in accordance with law, or that the provisions of Subchapter A of Chapter 5 (relating to practice and procedure of Commonwealth agencies) have been violated in the proceedings before the agency, or that any finding of fact made by the agency and necessary to support its adjudication is not supported by substantial evidence. If the adjudication is not affirmed, the court may enter any order authorized by 42 Pa.C.S. § 706 (relating to disposition of appeals).[85]

As this Court has noted, this standard is "self-explanatory, except, perhaps for the provision that agency action may be reversed in the event that it is 'not in accordance with law.'"[86] In *Slawek*, we understood this phrase as an incorporation of preexisting law governing the review of agency decisions, as articulated in decisions such as *Blumenschein v. Pittsburgh Housing Authority*.[87]

*Blumenschein* made clear that, when reviewing an agency's discretionary act, courts must not substitute their own discretion for that of the agency, and the fact that "the court might have a different opinion or judgment in regard to the action of the agency is

---

[85]    2 Pa.C.S. § 704.

[86]    *Slawek*, 586 A.2d at 364-65.

[87]    *See id.* at 365-66 (discussing *Blumenschein v. Pittsburgh Hous. Auth.*, 109 A.2d 331, 334-35 (Pa. 1954)).

not a sufficient ground for interference."[88]   Yet, "the mere possession of discretionary power by an administrative body does not make it wholly immune from judicial review"; such review is merely "limited to the determination of whether there has been a manifest and flagrant abuse of discretion or a purely arbitrary execution of the agency's duties or functions."[89]  In *Slawek*, this Court carried forward that standard as an articulation of what it means for an agency's adjudication to be "not in accordance with law."[90]

This Court returned to the "not in accordance with law" element of Section 704 review in *Fraternal Order of Police v. Pennsylvania Labor Relations Board*, in which we noted that the "standard has been described in a number of ways," but that its "essential import is to establish limited appellate review of agency conclusions to ensure that they are adequately supported by competent factual findings, are free from arbitrary or capricious decision making, and, to the extent relevant, represent a proper exercise of the agency's discretion."[91]  We also have made clear that this standard subsumes review for "capricious disregard" of material evidence, for such an error "is not only legal but structural and, pursuant to legislative design and long-standing principles, requires correction."[92]

---

[88]     *Blumenschein*, 109 A.2d at 335.

[89]     *Id.*

[90]     *Slawek*, 586 A.2d at 365 ("As the *Blumenschein* court put it, a reviewing court may interfere in an agency decision only when 'there has been a manifest and flagrant abuse of discretion or a purely arbitrary execution of the agency's duties or functions.'").

[91]     *Fraternal Ord. of Police v. Pa. Lab. Rels. Bd.*, 735 A.2d 96, 99 (Pa. 1999) (citing *Slawek*, 586 A.2d at 365).

[92]     *Leon E. Wintermyer, Inc. v. W.C.A.B. (Marlowe)*, 812 A.2d 478, 487 (Pa. 2002); *see also id.* ("Since an adjudication cannot be in accordance with law if it is not decided on the basis of law and facts properly adduced, we hold that review for capricious disregard of material, competent evidence is an appropriate component of appellate consideration in every case in which such question is properly brought before the court.").

We agree with the Commonwealth Court that the Board's licensing decision in the instant case falls below this standard. As that court noted, the Board's articulation of its rationale broadly fell into two categories: (1) problems that the Board identified with the skill games industry in general due to its unregulated nature, and (2) detrimental economic effects on casinos and the lottery. Taking the latter first, it hardly needs to be explained that an activity's economic impact upon ostensibly favored industries has nothing at all to do with the "good character," "honesty," or "integrity" of the participants. The Board stated that it found the "loss of revenue realized at licensed facilities and lottery establishments as a result of 'skill-based' games" to be "concerning."[93] The Board extrapolated from there to express its concern for the programs that are connected to lottery revenue, which benefit older Pennsylvanians. The Board then discussed the purported economic harms to casinos, pointing to the reduction in the number of slot machines at various casinos and their representatives' comments blaming the proliferation of skill games for the decreased revenue.[94]

The Board presently complains of the Commonwealth Court's observation that it relied upon its "own policy determinations" in rendering its licensing decision,[95] but it is difficult to understand the Board's concerns for casino and lottery revenue as anything other than an articulation of economic policy preference. Recall that the basis for the Board's decision was its determination that the applicants lack the "good character, honesty and integrity" required for licensure as principals under the Video Gaming Act.[96] Even assuming the truth of the Board's assertion that some casinos have lost business

---

[93]    Corrected Adjudication at 34.

[94]    *Id.* at 34-36.

[95]    *See* Board's Br. at 43 (quoting *Better Bets Ventures,* 304 A.3d at 76).

[96]    4 Pa.C.S. § 3504(c).

to skill games, or that fewer lottery tickets are sold, these facts have nothing whatsoever to do with the character, honesty, or integrity of Teitelbaum or the Brozzetti brothers. Economic competition does not make one a bad or dishonest person. Because this component of the Board's rationale is utterly disconnected from the grounds for its decision, the Board's adjudication smacks of the "arbitrary or capricious decision making" that a court cannot tolerate.[97]

The Board's concerns about the unregulated nature of the skill games industry fare no better. This component of the Board's rationale likewise had little to do with the "good character," "honesty," or "integrity" of the applicants. Indeed, it had nothing to do with the *applicants* at all. A significant aspect of the Board's argument to this Court revolves around its claim that the adjudication was not arbitrary or based upon a capricious disregard of evidence because the Board relied upon the above-discussed testimony of Major Miller and Drew Svitko before the House Gaming Oversight Committee—testimony that was included in the evidentiary record to which the parties stipulated. But the fact that this testimony was present in the record does not mean that it established a sufficient basis for decision. The Board relied upon this testimony in order to detail the risks and harms that skill games pose in Pennsylvania due to the lack of adequate regulation. The Board particularly emphasized the absence of controls to protect consumers, to prevent underage gambling, and to address compulsive and problem gambling.[98]

Even accepting as true all of the Board's characterizations of the problems posed by the skill games industry in general, the Board's analysis was not directed to the personal qualities of the applicants, as the Video Gaming Act demands. The Act requires, as a condition of licensure, a showing that "*the applicant* is a person of good character,

---

[97] *Fraternal Ord. of Police*, 735 A.2d at 99.

[98] Corrected Adjudication at 29-31.

honesty and integrity and is eligible and suitable to be licensed as a principal."[99]  On its face, this provision calls for a personal assessment of the qualities of the applicant.  The Board did not engage in the necessary assessment.  Instead, the Board relied exclusively upon generalizations about an entire industry and used them as a proxy for the individualized character assessment that the Act directs the Board to perform.  As the Commonwealth Court noted, "the Board does not indicate anywhere in its Corrected Adjudication how the problems it finds with the skill games industry denigrate and render unsuitable the 'character, honesty and integrity' of *these specific Petitioners*," *i.e.*, Teitelbaum and the Brozzettis.[100]

The Commonwealth Court's observation was correct.  Notwithstanding that skill games, in general, may pose various problems of the sort that the Board identified, the Board failed to connect any of those issues to the applicants here.  The Board identified no evidence indicating that any of the particular devices sold or operated by the applicants presented such problems.  No evidence emerged that Teitelbaum or the Brozzetti brothers ever have allowed minors to use the devices, that they have fostered compulsive gambling, or anything of the sort.

The Commonwealth Court also correctly pointed out the absence of any other particularized indicia of the character of the applicants, noting that the Board did not identify "any criminal convictions or investigations, tax-evading financial practices, connections with organized crime, false statements, or other nefarious or even allegedly nefarious conduct" on the part of any of the applicants.[101]  This was not, as the Board suggests, an instance of the court "re-weighing" the evidence in violation of its standard

---

[99]     4 Pa.C.S. § 3504(c) (emphasis added).

[100]     *Better Bets Ventures*, 304 A.3d at 76 (emphasis in original).

[101]     *Id.*

of review.  Rather, the court was highlighting the *absence* of any evidence of the sort that would support a determination that these particular applicants are deficient in character, honesty, or integrity.  The court's comments on that point were neither improper nor erroneous.

The arbitrariness of the Board's decision is all the more apparent when one compares its determinations concerning Teitelbaum and the Brozzetti brothers with the Board's finding about the applicant who prevailed, Brent Mayes.  As noted above, the Board commended Mayes' decision to exit the skill games industry voluntarily, and it contrasted his decision with those of Teitelbaum and the Brozzetti brothers to continue offering skill games while their background investigations continued.  Yet, as the Board explained, Mayes made this decision only after being questioned by the Board's background investigators, and only "because he, rightfully, did not want to jeopardize his ability to offer video gaming terminals, which he believed have a brighter future in Pennsylvania."[102]  Thus, on the Board's own account, Mayes made a business decision, not a moral one.  The fact that this alone was enough to sway the Board reveals that the Board merely rewarded Mayes for his submission to the Board's views, which, as the Board acknowledged, he did purely for pecuniary gain.  That this decision, by itself, translated into a finding of satisfactorily "good character, honesty and integrity" for Mayes is further indicative that the Board's denial of Teitelbaum's and the Brozzettis' applications was arbitrary and capricious.

## IV. Conclusion

The elephant in the room is the question of whether the operation of so-called "skill games" in unlicensed premises is actually lawful under the Gaming Act and the Crimes Code.  The Board's OEC is of the opinion that skill games are unlawful, unregulated slot

---

[102]    Corrected Adjudication at 38.

machines, and the Board may well share that view, as it stated that the legality of the devices is "debatable."[103] Nonetheless, both the Board and the public at large are subject to the Commonwealth Court's precedential rulings that the devices in question are not regulated under the Gaming Act.[104] This Court will consider the merits of the Commonwealth Court's decisions on those matters in the due course of appellate review. This case does not impact those rulings, and whatever we may decide in those appeals does not bear upon this one.

Regardless of the legality of "skill games" as they have proliferated in Pennsylvania, the industry that has sprung up around them involves thousands of Pennsylvanians who are under the impression that they are operating fully within the bounds of the law. They have been led to believe this through court rulings and through the representations of the device manufacturers and their lawyers. Given this landscape, it is reasonable for these individuals to believe that they are doing nothing wrong. Indeed, "skill games" now appear on the premises of many honest business owners, who surely would not operate them if they knew them to be illegal. It is, thus, excessive and unfair for the Board to declare that every individual involved in this industry lacks "good

---

[103] *Id.* at 31; *see id.* at 23-24 (detailing OEC's position on the legality of skill games).

[104] *See supra* n.8. These rulings of the Commonwealth Court, particularly *In re Three Pennsylvania Skill Amusement Devices*, 306 A.3d 432, have one final effect upon this case. The Board found substantial evidence that the Brozzetti brothers, through Hugo, have operated illegal gambling devices for purposes of 18 Pa.C.S. § 5513, due to the Court of Common Pleas' ruling about the "Diamond Choice" skill games in the Luzerne County case. *See* Corrected Adjudication at 27. The Commonwealth Court differed with the Board, finding that the Brozzettis' connections to Hugo were "attenuated" because the Brozzettis only owned part of Hugo. *Better Bets Ventures*, 304 A.3d at 78. Given that the Brozzettis owned two-thirds of Hugo at that time (and are now 100% owners), we cannot endorse the Commonwealth Court's suggestion of the Brozzettis' purportedly "attenuated" connection to the business. Nonetheless, we remand with regard to the Brozzettis' application as well because, in light of the Commonwealth Court's *en banc* ruling in *In re Three Pennsylvania Skill Amusement Devices*, it is not clear that the devices that the Brozzettis operated ran afoul of Section 5513 of the Crimes Code.

character, honesty and integrity" merely due to their involvement in the industry. Absent any other evidence to support that determination with regard to a specific applicant, an adjudication of this sort is arbitrary, capricious, and an abuse of discretion, and accordingly must be reversed.[105]

It is true that the Video Gaming Act vests the Board with the discretion to issue, or not to issue, licenses pursuant to that enactment.[106] But the Board's discretion is not absolute. "Discretion does not entail unbridled freedom for an agency to do absolutely whatever it pleases."[107] Rather, the exercise of discretion rests upon "the foundation of reason, as opposed to prejudice, personal motivations, caprice or arbitrary actions."[108] We agree with the Commonwealth Court that the Board here "erred and abused its discretion" in denying the license applications on the grounds that it articulated.[109]

Nonetheless, we cannot affirm the Commonwealth Court's order *in toto*. After reversing the Board's adjudication, the Commonwealth Court remanded to the Board "with instructions to issue the requested licenses."[110] Because the court issued this order without regard for any other requisite for licensure beyond the "good character, honesty and integrity" requirement, the court here exceeded the bounds of its review. Notably, even with regard to Mayes, who the Board found able to satisfy the character requirement, the Board directed that he and his company, Venture Gaming, "continue in the application process," and ordered that their applications be "remanded to the Bureau of Investigations

---

[105]    *See Slawek*, 586 A.2d at 365; *Fraternal Ord. of Police*, 735 A.2d at 99.

[106]    *See* 4 Pa.C.S. § 3301(b).

[107]    *Commonwealth v. State Conf. of State Police Lodges of Fraternal Ord. of Police*, 520 A.2d 25, 28 (Pa. 1987).

[108]    *Coker v. S.M. Flickinger Co.*, 625 A.2d 1181, 1184-85 (Pa. 1993).

[109]    *Better Bets Ventures*, 304 A.3d at 79.

[110]    *Id.*

and Enforcement for the completion of all outstanding investigative work."[111]  There may be other matters for the Board to address before granting any of the requested licenses. Our ruling today is limited to the reversal of the Board's determination on the "good character, honesty and integrity" requirement, and we do not order the Board to take any particular course of action with regard to the applications on remand.

The order of the Commonwealth Court is vacated, and the matter is remanded for further proceedings consistent with this opinion.

Chief Justice Todd and Justices Donohue, Dougherty, Mundy, Brobson and McCaffery join the opinion.

---

[111]    Corrected Adjudication at 39.